**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LINDA RICE on behalf of plaintiff and the class defined below, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| MIDLAND CREDIT MANAGEMENT, INC.; MIDLAND FUNDING LLC; and ENCORE CAPITAL GROUP, INC., formerly MCM CAPITAL GROUP, INC., | ) ) ) ) ) |
| Defendants. | ) ) |

**COMPLAINT – CLASS ACTION**

**INTRODUCTION**

1. Plaintiff Linda Rice brings this action to secure redress from unlawful collection practices engaged in by defendants Midland Credit Management, Inc. ("MCM"); Midland Funding, LLC; and Encore Capital Group, Inc., formerly known as MCM Capital Group, Inc. ("Encore"). Plaintiff alleges violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA").

2. The FDCPA broadly prohibits unfair or unconscionable collection methods; conduct which harasses, oppresses or abuses any debtor; and any false, deceptive or misleading statements, in connection with the collection of a debt; it also requires debt collectors to give debtors certain information. 15 U.S.C. §§1692d, 1692e, 1692f and 1692g.

**VENUE AND JURISDICTION**

3. This Court has jurisdiction under 15 U.S.C. §1692k (FDCPA), 28 U.S.C. §1331 (general federal question) and 28 U.S.C. §1337 (interstate commerce).

4. Venue and personal jurisdiction in this District are proper because:

   a. Defendants' collection communications and activities impacted plaintiff within this District;

1

b. Defendants do or transact business within this District.

## PARTIES

### Plaintiff

5. Plaintiff Linda Rice is an individual who resides in the Northern District of Illinois.

### Midland Funding

6. Defendant Midland Funding, LLC is a Delaware limited liability company with its principal place of business at 3111 Camino Del Rio N, #1300, San Diego, CA 92108. It does or transacts business in Illinois. Its registered agent and office are Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, IL 62703.

7. Defendant Midland Funding LLC is in the business of taking title or claiming to take title to charged-off debts allegedly owed by consumers and originally owed to others.

8. Defendant Midland Funding LLC then seeks to enforce the debts against the consumers through lawsuits.

9. Most of the debts which defendants seek to collect are credit cards originally issued by banks. For example, during 2010, Encore reported that it purchased credit card receivables with a face value of $341,910,000 out of a total of $361,957,000 of all receivables, or more than 94%. (Encore Capital Form 10-K filed with the Securities & Exchange Commission for year ending Dec. 31, 2010, original page 25)

10. Defendant Midland Funding LLC has paid an average of less than 5 cents on the dollar for the debts it has purchased or claims to have purchased.

11. Defendant Midland Funding LLC was the plaintiff in over 3,000 collection lawsuits pending in the Illinois courts during the year preceding the filing of this action. Between May 16, 2011 and July 7, 2011, a period of less than two months, Midland Funding LLC filed 1,000 collection lawsuits in Cook County alone.

12. The mails and telephone system are used in connection with the prosecution

of these Midland Funding LLC lawsuits.

13. Defendant Midland Funding LLC is a "debt collector" as defined in the FDCPA.

## MCM

14. Defendant MCM is a Kansas corporation with its principal place of business also located at 3111 Camino Del Rio N, #1300, San Diego, CA 92108. MCM does business in Illinois. Its registered agent and office are Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, IL 62703.

15. Defendant MCM is a collection agency and collects the bad debts allegedly purchased by MRC.

16. Defendant MCM holds a collection agency license from the state of Illinois.

17. Defendant MCM uses the mails and telephone system to conduct its business.

18. Defendant MCM is a "debt collector" as defined in the FDCPA.

## Encore

19. MCM and Midland Funding LLC are under common ownership. Both are subsidiaries of Encore, a publicly traded Delaware corporation, with offices at 3111 Camino Del Rio N, #1300, San Diego, CA 92108.

20. Encore has stated in its filings with the Securities & Exchange Commission that "We are a leader in consumer debt buying and recovery. We purchase portfolios of defaulted consumer receivables at deep discounts to face value and use a variety of operational channels to maximize our collections from these portfolios." Form 10-K filed by Encore with the SEC for year ending Dec. 31, 2010, original page 1.

21. Encore (a) secures funds from investors and lenders for the purpose of purchasing the debts to which Midland Funding LLC takes title, (b) devises the collection strategies used by the other defendants, and (c) participated in the debt collection activities complained of.

22. On March 10, 2005, Encore stated to public investors that it is a "50 year old

purchaser and manager of consumer receivables portfolios." Form 8-K filed by Encore with the SEC on March 10, 2005.

23. Encore is a "purchaser and manager of charged-off consumer receivables portfolios" – i.e., bad consumer debts. " Form 8-K filed by Encore with the SEC on March 3, 2005, including Exhibit 99.1 thereto.

24. Encore "acquires these portfolios at deep discounts from their face values." A June 9, 2011 filing with the SEC (Form 8K, Exhibit 99.1) reflecting a presentation at an "Investor Day" by Brandon Black, President and Chief Executive Officer, Paul Grinberg, EVP and Chief Financial Officer, Amy Anuk vice president for Business Development and Manu Rikhye, Managing Director of India Operations, stated that Encore had invested $1.9 billion to acquire receivables with a face value of $58 billion since its inception, or about 3.3 cents on the dollar, and had acquired 34 million consumer accounts since its inception.

25. The same document states that in 2011 legal collections resulted in revenue of $266.8 million in 2010 and $88.5 million during the first quarter of 2011.

26. During 2010, total collections by Encore amounted to $604.6 million (Form 10-K for year ending Dec, 31, 2010, original page 25), so that the legal collections were over 44% of the total.

27. Encore devises the "collection strategies" used by its subsidiaries. Form 10-K filed by Encore with the SEC for the year ending December 31, 2010, original p. 6, states, under "Collection Approach," that "We expand and build upon the insight developed during our purchase process when developing our account collection strategies for portfolios we have acquired. Our proprietary consumer-level collectability analysis is the primary determinant of whether an account is actively serviced post-purchase. Throughout our ownership period, we periodically refine this analysis to help determine the most effective collection strategy to pursue for each account."

28. On Oct. 28, 2004, Encore CEO Gregory stated in an earnings conference call:

> . . . Our board also elected Brandon Black, President and Chief Operating Officer of the Company. Brandon has been Executive Vice President and Chief Operating

4

> Officer for the past 5 years and has done a superb job. Brandon is the architect of many of the analytical procedures and collection processes that distinguish Encore's approach to the business. His intelligence, analytical ability and drive for success have been instrumental in Encore's success and in his new role will be key factors as we continue to build the business. . . .
>
> On the purchasing front, we invested $21 million in new portfolios during the quarter, up 10 percent from the prior year's quarters purchases of $19 million. Our average purchase price for the quarter was 2.91 percent which was down slightly from last year's 3.02 percent. This was not as much as we had hoped to invest but appropriate given the high prices for much of the available supply.
>
> Year-to-date, our purchases have been $57 million or about $7 million less than last year's first 3 quarters. For the year-to-date, approximately 48 percent of our purchases have been non-credit card, compared with just 6 percent last year for the same period. We will have more to say about purchasing in a minute but the purchasing discipline and analytical approach we've always taken are more important now than ever before. . . .

29.     Encore is responsible for determining what debts to purchase and at what price. In an earnings conference call conducted by executives of Encore on Aug. 3, 2004, Encore CEO Gregory stated:

> Encore enjoyed another good quarter. Our collections, revenue and net income all increased. In addition, we closed a terrific new loan with J.P. Morgan Chase that dramatically lowers our cost of borrowing, increases our flexibility, and should result in better financial returns for Encore.
>
> Finally, just after the end of the quarter, we closed the biggest purchase we've ever made on terms we considered quite attractive. We are very excited about our industry and its future, but most importantly, Encore's ability to excel in the future.

30.     On Aug. 3, 2004, Encore CEO Gregory stated in another such call:

> We believe our business model is especially well-suited to this changing environment. Specifically, our business model emphasizes customer-level rather than portfolio-level analytics, innovative and flexible collection processes and conservative accounting.
>
> The keystone to everything we do is customer-level analytics -- understanding the individual customer and his changing ability to pay. Prior to purchase and throughout our ownership, we analyze the individual customer's ability and willingness to pay. We are always asking the same question -- can this particular customer pay us all or some of what he owes now? By focusing on the customer and information about him, we are able to move comfortably across various asset types as well as the portfolio ages or time since charge-off. In this process, a score is generated for every single account we own and the score is refreshed quarterly to ensure that it maintains its accuracy.

5

> The second major aspect of our business model is our use of innovative collection strategies that are driven by the underlying collectibility score of each customer. In other words, to fully benefit from the new information we are generating about the individual customers, we have to be able to apply different collection strategies as appropriate, or at least be able to apply the traditional approaches in new ways that will be more effective.
>
> We now have eight unique revenue channels that each contribute more than $1 million per month in collections, including direct mail, balance transfer, external legal, and our recently developed agency outsourcing strategy.

31. Among other things, Encore determines the age of the debts that are purchased, and whether out-of-statute debts will be acquired.

32. Because of its intimate involvement in collection activities, Encore is a debt collector as defined in the FDCPA.

## FACTS

33. Defendants have been attempting to collect from plaintiff an alleged credit card balance claimed to have been incurred for personal, family or household purposes and not for business purposes.

34. Plaintiff disputed the debt.

35. Beginning in April 2011, MCM sent plaintiff a series of letters attached as Exhibits A-D seeking to collect on the alleged credit card debt.

36. Exhibits A-D are form documents regularly used by defendant MCM.

37. Each of Exhibits A-D was sent by MCM on behalf of Midland Funding LLC.

38. The last payment on the alleged debt was on January 19, 2006.

39. The statute of limitations on a credit card bill in Illinois is five years.

40. Defendants regularly attempt to collect debts on which the statute of limitations has expired.

41. Nothing in Exhibits A, B, C or D disclosed that the debt was barred by the statute of limitations.

42. Nothing in Exhibits A, B, C, or D disclosed the date of the transactions

6

giving rise to the claimed debt.

43. It is the policy and practice of defendants to send letters seeking to collect time-barred debts that do not disclose the fact that they are time-barred.

44. It is the policy and practice of defendants to send letters seeking to collect time-barred debts that do not disclose the dates of the transactions giving rise to the debts.

45. The Federal Trade Commission has determined that "Most consumers do not know their legal rights with respect to collection of old debts past the statute of limitations . . . . When a collector tells a consumer that she owes money and demands payment, it may create the misleading impression that the collector can sue the consumer in court to collect that debt." (http://www.ftc.gov/opa/2012/01/asset.shtm)  The FTC entered into a consent decree with Asset Acceptance, one of the largest debt buyers in the United States, requiring that it disclose to consumers when it is attempting to collect debts that are barred by the statute of limitations. *United States of America (For the Federal Trade Commission) v. Asset Acceptance, LLC,* Case No. 8:12-cv-182-T-27EAJ (M.D.Fla.).

## **VIOLATION ALLEGED**

46. Defendants engaged in unfair and deceptive acts and practices, in violation of 15 U.S.C. §§1692e, 1692e(2), 1692e(10), and 1692f, by dunning consumers on time-barred debts without disclosure of that fact.

47. The nondisclosure is exacerbated by the offer of a "settlement" in Exhibits A, C and D. An offer to settle implies a colorable obligation to pay.

48. Section 1692e provides:

> **§ 1692e.    False or misleading representations [Section 807 of P.L.]**
>
> **A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .**
>
> **(2)    The false representation of--**
>
> **(A)    the character, amount, or legal status of any debt; . . .**

> **(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .**

49. Section 1692f provides:

> **§ 1692f. Unfair practices [Section 808 of P.L.]**
>
> **A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. . . .**

## CLASS ALLEGATIONS

50. Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

51. The class consists of (a) all individuals in Illinois, Indiana and Wisconsin, (b) to whom any of the defendants (c) sent a letter seeking to collect a debt (d) which debt was a credit card debt on which the last payment had been made more than five years (Illinois) or six years (Indiana and Wisconsin) prior to the letter (e) which letter was sent on or after a date one year prior to the filing of this action and on or before a date 20 days after the filing of this action.

52. On information and belief, the class is so numerous that joinder of all members is not practicable.

53. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are (a) whether defendants attempt to collect time-barred debts without disclosure of that fact and (b) whether such practice violates the FDCPA.

54. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

55. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and FDCPA litigation.

56. A class action is superior for the fair and efficient adjudication of this matter, in that:

  a. Individual actions are not economically feasible.

  b. Members of the class are likely to be unaware of their rights;

  c. Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

WHEREFORE, the Court should enter judgment in favor of plaintiff and the class members and against defendants for:

  (1) Statutory damages;

  (2) Actual damages, including all amounts paid on time-barred debts;

  (3) Attorney's fees, litigation expenses and costs of suit;

  (4) Such other and further relief as the Court deems proper.

    s/Daniel A. Edelman
    Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER
 & GOODWIN, L.L.C.
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## NOTICE OF ASSIGNMENT

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
     & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)